Argued September 19, affirmed October 20, 1975

GEENTY, *Respondent, v.* HYSTER, INC.
(No. 412-893), *Appellant.*

541 P2d 486

*Ridgway K. Foley, Jr.,* Portland, argued the cause for appellant. With him on the brief were James D. Huegli and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

*Burl L. Green,* Portland, argued the cause for re-

spondent. With him on the brief were Green, Griswold & Pippin, Portland.

Before Schwab, Chief Judge, and Langtry and Foley, Judges.

FOLEY, J.

Claimant is a 34-year-old forklift operator who filed a claim for compensation for degenerative upper back disease which became manifest, off the job, on a Saturday morning when he leaned over in bed to kiss his wife. At that time he experienced a painful kink in the neck which continued to bother him. The carrier and referee denied his claim. The Workmen's Compensation Board found that claimant had sustained an occupational disease and ordered the claim accepted. The circuit court affirmed the Workmen's Compensation Board and the carrier and employer appeal to this court.

Claimant had worked for Hyster, Inc., since 1965. His occupation the last three or four years was that of forklift operator and part-time carry crane operator. He worked a 40-hour week, plus some occasional overtime. In operating the forklift truck it was necessary to drive the vehicle backwards a good percentage of the time.[1] While operating in reverse it was necessary to turn his head and look over either shoulder. Since other people were in the area, it was necessary to look backward and all around to avoid personnel and to direct the vehicle. Claimant testified he operated the carry crane 20 to 30 percent of his time and this included driving in a backward direction. It had a boom of 30 or 40 feet and it was necessary in its operation for claimant to look upward to the top of

---

[1] Claimant testified up to 70 percent of the time. His foreman estimated 20 percent of the time.

the crane for clearance, as well as viewing all about the area in which he was proceeding.

In the six or seven months preceding the December 1973 incident in which he leaned over to kiss his wife, claimant testified that he had several times experienced these pains when he was driving his forklift with a capacity load, going over a bump. In November and December he complained to his supervisor about a pain shooting down his neck and shoulder and down to the area of the heart.

Dr. Donald T. Smith, a neurosurgeon, testified that claimant has a degenerative cervical disc disease in the upper back. He testified that it was his opinion that there is a direct correlation between claimant's cervical disc disease and his employment as a lift truck operator. He testified that claimant's activities as a forklift driver did not cause the degenerative disc disease, but that in his opinion the claimant's job was a substantial contributing factor and a constant source of aggravation and acceleration of the degenerative process causing the condition to become symptomatic.

An occupational disease is defined in ORS 656.802 as follows:

> "(1) * * * '[O]ccupational disease' means:
>
> "(a) Any disease or infection which arises out of and in the scope of the employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein.
>
> "* * * * *."

An occupational disease is treated the same as an injury under the Workmen's Compensation Law. ORS 656.804 provides:

> "An occupational disease, as defined in ORS 656.802, is considered an injury for employes of

employers who have come under * * * [the Workmen's Compensation Law]."

*Beaudry v. Winchester Plywood Co.*, 255 Or 503, 469 P2d 25 (1970), is in point. There claimant suffered an aggravation of preexisting bursitis as a result of having to stand on a vibrating platform during the course of his employment. The principal issue was the employer's contention

"* * * that the Oregon definition of occupational disease requires 'the work exposure [to] be the original or underlying etiological cause of the disease itself.' They [employer] claim the definition does not encompass the aggravation of a preexisting condition and that work-induced disability does not make the disease 'occupational.'" (1st brackets theirs.) 255 Or at 511.

Our Supreme Court held:

"* * * We believe the statutory definition was not intended to be limited in its scope to disease or infection which had its inception in the employment. ORS 656.804(1) specifies that an occupational disease, as defined, is to be 'considered an injury' for the employees of employers who come under the accidental injury portion of the law. It is clear that under the accidental injury portion of the law a compensable injury occurs when an accidental injury accelerates or aggravates a preexisting disease, causing disability or death, even though the definition of a compensable injury is '* * * an accidental injury * * * arising out of and in the course of employment * * *.' ORS 656.-002(6)." (Footnotes omitted.) 255 Or at 512.

The court then quoted from 1A Larson, Workmen's Compensation Law § 41.62, which has been updated as of 1973 and is § 41.63. It now reads as follows:

"Closely related to the question of preexisting allergy is that of preexisting weakness, disease, or susceptibility. Most courts treat this problem

the same as that of allergies, and hold that when distinctive employment hazards act upon these preexisting conditions to produce a disabling disease, the result is an occupational disease. Thus when admittedly nonindustrial pulmonary emphysema was aggravated by employment dust and fumes, Oklahoma concluded that the end product was an occupational disease. New Jersey struggled with the problem, and finally concluded that aggravation of a nonoccupational fungoid condition by repeated exposure to benzine constituted a compensable disease. New York has accepted as compensable a low-back strain caused by continued lifting superimposed upon a congenitally weak back, Dupuytren's contracture in the palms of hands possibly due in part to a physiological defect, and aggravation of preexisting arteriosclerotic vascular disease. Oregon has held in the same way as aggravation of an injury. [Citing Beaudry v. Winchester Plywood Co., supra.] Delaware has [held] that aggravation of occupational disease should be treated [and] compensated for aggravation of a sandblaster's Boeck's sarcoid disease. And Michigan has added 'tennis elbow' to this category involving preexisting susceptibility.

"It can readily be seen that, as this process has gone forward, the line between occupational disease and aggravation of preexisting disease or weakness has become blurred. The ultimate working rule that seems to emerge is simply that a disability which would be held to arise out of the employment under the tests of increased risk and aggravation of a preexisting condition will be treated as an occupational disease." (Footnotes omitted.)

Defendant-employer in *Beaudry* contended that claimant's activities could have been aggravated by walking, standing, and going up and down stairs, activities unrelated to his employment. Employer here

urges, similarly, that since one turns his head frequently in daily off-the-job activities, the nonwork activities could aggravate claimant's condition. In *Beaudry* the court said:

> "* * * [T]here was sufficient evidence * * * that claimant's condition, which prevented him from working, was the result of a situation to which he was not ordinarily subjected other than in the course of his regular actual employment. * * *" 255 Or at 515.

In the present case, the evidence preponderates in favor of a finding that the driving of the forklift truck entailed unusual twisting and turning of the neck to which claimant was not ordinarily subjected other than in his regular employment and that this aggravated and made symptomatic claimant's preexisting degenerative disc disease. We agree with the conclusions reached by the Workmen's Compensation Board and the circuit court.

Affirmed.